UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA           Case No. 1:10-CR-627 (KAM)


             v.

RODNEY WATTS,

           Defendant.
------------------------------------------------------x


## MEMORANDUM IN SUPPORT OF MOTIONS *IN LIMINE*


Of Counsel:

Marion Bachrach, Esq.
Gabrielle E. Farina, Esq.

Richard D. Willstatter, Esq.

**THOMPSON & KNIGHT LLP**
900 Third Avenue, 20th Floor
New York, New York 10022
Tel:    (212) 751-3001
Fax:    (212) 751-3113

**GREEN & WILLSTATTER**
200 Mamaroneck Avenue, Suite 605
White Plains, New York 10601
Tel:    (914) 948-5656
Fax:    (914) 948-8730

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................2

ARGUMENT............................................................................................................4

**I.**    The Recordings Between Emilio Serrano and Frank Patello Are Inadmissible Because They Are Not Subject to the Hearsay Exception For Co-Conspirators..............4

**II.**    The Recordings Made By Serrano Are Inadmissible Where the Government Failed to Preserve and Identify the Documents Referred to in the Recordings................9

**III.**    The Court Should Preclude Direct or Cross-Examination Testimony Concerning Any Illness, Medical Diagnosis or Other Ailment Afflicting a Witness or Members of the Witness' Family......................................................................................18

**IV.**    The Court Should Prohibit the Government from Referring to or Identifying GDC as a "Shell" Company. ......................................................................................19

**V.**    Given the Government's Cross-Examination of Dupree, Defendant Watts Seeks Clarification About Cross-Examining Veronica Finn Regarding Her Husband's Former Position as an FBI Agent, Her Non-Privileged Communications With Him, and the Government's Decision Not to Charge Her. ............................................20

**VI.**    The Testimony of Dupree Should Be Admitted Into Evidence.....................................24

**VII.**    The Indictment, With Its Long Narrative, Should Not Be Read to the Jury...................27

**VIII.**    The Court Should Preclude The Government From Arguing or Eliciting Testimony To the Effect That Its Witnesses Pled Guilty to Conspiring With or Lying With Defendant Watts and Give A Cautionary Instruction. ...............................28

**IX.**    The Court Should Grant Defendant Watts' Written Requests For Identification and Production of Documents and Materials As Well As Access to Original Documents. ..........................................................................................................29

CONCLUSION.......................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256 (2004) ................................................... 23

*Brady v. Maryland*, 373 U.S. 83 (1963) ......................................................................... 31

*Guccione v. United States*, 1987 U.S. Dist. LEXIS 8262 ............................................... 15

*In re Corrugated Container Antitrust Litig.*, 644 F.2d 70 (2d Cir. 1981) ....................... 26

*Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716 (1949)...................................... 8

*Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 973 (1952)....................................... 23

*Liberman v. Fedex Ground Package System Inc.*, 09 CV 2423 (RML), 2011 U.S. Dist. LEXIS 4401 (E.D.N.Y. Jan. 18, 2011) ................................................................................... 14

*Merlin v. Aetna Life Ins. Co.*, 180 F.Supp. 90 (S.D.N.Y. 1960)..................................... 23

*Pension Committee Of the Univ. of Montreal Pension Plan v. Banc of Am. Secs, LLC*, 05 Civ. 9016 (SAS), 2010 U.S. Dist. Lexis 4546 (S.D.N.Y. Jan. 15, 2010) ....................................... 16

*Phoenix Assoc. III v. Stone*, 60 F.3d 95 (2d Cir. 1995) .................................................. 17

*Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253 (2d Cir. 1999) ................................ 14

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002)................. 14

*Rogers v. United States*, 340 U.S. 367 (1951) ................................................................ 24

*United States  v. Beltempo*, 675 F.2d 472 (2d Cir. 1982) ................................................ 24

*United States  v. Dupree*, 833 F.Supp.2d 255 (E.D.N.Y. 2011) ................................. 20, 23

*United States v. Aref*, 533 F.3d 72 (2d Cir. 2008) .......................................................... 31

*United States v. Bahadar*, 954 F.2d 821 (2d Cir. 1992) .................................................. 24

*United States v. Bentvena*, 319 F.2d 916 (2d Cir. 1963) ................................................. 26

*United States v. Binger*, 469 F.2d 275 (9th Cir. 1972) ................................................... 29

*United States v. Carson*, 560 F.3d 566 (6th Cir. 2009) ................................................... 29

*United States v. Esso*, 684 F.3d 347.............................................................................. 27

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985).................................................. 5

*United States v. Greenfield*, 44 F.3d 1141 (2d Cir. 1995) ................................................. 6

*United States v. Halbert*, 640 F.2d 1000 (9th Cir. 1981).................................................. 29

*United States v. Lieberman*, 637 F.2d 95 (2d Cir. 1980) ................................................... 4

*United States v. Lombardozzi,* No. S1 02 CR 273, 2003 WL 1956290 (S.D.N.Y. Apr. 24, 2003)... 4

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990).......................... 4, 5, 8

*United States v. Miranti*, 253 F.2d 135 (2d Cir. 1958) ................................................... 25

*United States v. Nerlinger*, 862 F.2d 967 (2d Cir. 1988)............................................................. 5, 6

*United States v. Paccione*,  949 F.2d 1183 (2d Cir. 1991) ................................................................ 18

*United States v. Ramirez*, 973F.2d 102 (2d Cir. 1992) ..................................................................... 29

*United States v. Rigas*, 258 F.Supp.2d 299 (S.D.N.Y. 2003) ......................................................... 13

*United States v. Rodriguez*, 706 F.2d 31 (2d Cir. 1983)............................................................. 24, 25

*United States v. Ross,* 77 F.3d 1525 (7th Cir. 1996)........................................................................ 20

*United States v. Simmons*, 923 F.2d 934 (2d Cir.) .............................................................................. 5

*United States v. Stevens*, 985 F.2d 1175 (2d Cir. 1983) .................................................................. 31

*United States v. Suarez*, No. 09-032 (JLL), 2010 WL 4226524 (D.N.J. Oct. 21, 2010) ................. 15

*United States v. Truman*, 688 F.3d 129 (2d Cir. 2012)..................................................................... 26

*United States v. White*, 692 F.3d 235 (2d Cir. 2012) ....................................................................... 23

*United States. v. Salim*, 189 F.Supp.2d 93 (S.D.N.Y. 2002) ........................................................... 18

*Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422 (S.D.N.Y. 2004)................................................... 16

**Rules**

Fed. R. Crim. P 16(a) ........................................................................................................................ 13

Fed. R. Crim.P.16(d)(2) .................................................................................................................... 31

Fed. R. Evid. 106 .............................................................................................................................. 17

Fed. R. Evid. 403 ......................................................................................................................... 18, 20

Fed. R. Evid. 801(d)(1)(A) ......................................................................................................... 24, 26, 27

Fed. R. Evid. 801(d)(2)(E)................................................................................................................. 4, 8

Fed. R. Evid. 804(b)...................................................................................................................... 24, 27

**Miscellaneous**

Leonard Sand *et al, Modern Federal Jury Instructions,* Instruction 7-10 .......................................32

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,                    Case No. 1:10-CR-627 (KAM)


      v.                    **MEMORANDUM IN SUPPORT OF MOTIONS *IN LIMINE***

RODNEY WATTS,


     Defendant.
-------------------------------------------------------x

  Defendant Rodney Watts submits this memorandum of law in support of his motions in limine to: (1) exclude the recordings of conversations between Emilio Serrano ("Serrano") and Frank Patello ("Patello") as impermissible hearsay; (2) exclude the recordings of conversations between Serrano and defendant Watts in which they discuss documents which have not been identified and do not appear to have been preserved, or, alternatively, have the Court give an instruction allowing an adverse inference to be drawn concerning the unavailable documents; (3) exclude testimony by any government witness concerning any illness, medical diagnosis or other ailment affecting any government witness or family members of any government witness; (4) prohibit the government from referring to GDC Acquisitions, LLC ("GDC") as a "shell" corporation; (5) clarify the ruling made by the Court prior to the trial of Courtney Dupree ("Dupree") and Thomas Foley ("Trial 1"), and, in light of the cross-examination of Dupree at Trial 1, permit defendant Watts to cross-examine Veronica Finn on: (a) whether she had non-privileged communications with her husband, a former FBI agent, or others, about reporting to law enforcement alleged fraud at GDC and its subsidiaries, about which she was informed, and (b) regarding the government's decision not to charge Ms. Finn; (6) admit in evidence the testimony given by Dupree at Trial 1; (7) respectfully request that the Court not read to the jury the indictment in this case because it does not merely state the statutory charges against the defendants but also contains a prejudicial narrative of the prosecution's version of the facts of the

case; (8) preclude the government from improperly arguing or eliciting testimony that its witnesses pled guilty to conspiring with or lying with defendant Watts; and (9) granting defendant Watts' written requests for identification and production of documents and other materials and information as well as access to original documents and materials prior to trial.[1]

Defendant Watts seeks an evidentiary hearing on those motions in which there are disputed facts at issue.

### PRELIMINARY STATEMENT

There has been a previous trial in this case of two other defendants, Dupree and Thomas Foley ("Trial 1"). Prior to trial, those defendants sought to exclude as hearsay telephone conversations that Serrano, in the role of government agent, recorded between May 17 and June 4, 2010 with Patello, the former CFO for GDC and its subsidiaries. The Court ruled prior to trial that there was no showing Patello had "performed an affirmative act to withdraw from the conspiracy". (Dkt. No. 447, p. 40). However, we move to exclude the recorded conversations with Patello because the factual assumptions made prior to trial were contradicted by testimony given at trial and the arguments made by the prosecution in summation. Throughout Trial 1, the prosecution clearly took the position, both by the testimony it elicited and by repeated arguments in summation, that Patello had resigned and "walked away from" the conspiracy months prior to the time when his telephone conversations were recorded by Serrano. (*See e.g*., T. 4216:9-10).

Serrano also made upwards of 44 recordings over 21 days, most of which were conversations with defendant Watts. Although Serrano intentionally recorded discussions regarding lengthy, complicated financial papers, the documents discussed on those recordings have not been identified nor do they appear to have been preserved to the best of our knowledge.

---

[1] Defendant Watts is aware that the government filed two letters – one on July 6, 2012 (Dkt. No. 557) and one earlier this week (Dkt No. 600) – by which it gave notice of its intention to introduce evidence concerning alleged prior acts of bank fraud. Based on the Fifth Amended Criminal Pretrial Scheduling Order, it is our understanding that the government must make a motion to introduce evidence of prior similar acts under Fed. R. Evid. 404(b) on November 30, 2012. Accordingly, Mr. Watts has refrained from responding to the arguments noted in the government's letters and will respond upon receipt of the government's formal motion.

Defense counsel has asked the prosecution on numerous occasions to identify the documents discussed on the recordings by bates-stamp and/or exhibit number, but the government has not replied to our request. (*See* Exhibits A and B to Bachrach Declaration). As set forth below, the recordings in which Serrano and Watts discuss documents that appear to be unavailable to the defense and to the jury should be excluded based on two legal principles: the doctrine of completion and the requirement that, where, as here, litigation is foreseeable or contemplated, a party has an obligation to preserve evidence and avoid spoliation.

Prior to Trial 1, the government made a motion in limine to prevent the defense from referencing any issues, including the prospective sentences faced by defendants, which might evoke sympathy from the jury. At Trial 1, however, the government sought to evoke sympathy by eliciting testimony about illness or medical problems affecting the family members of several witnesses (Serrano, Patello and Nusfaumer). Mr. Watts moves to exclude testimony regarding illness, medical diagnosis or other ailments affecting a witness or members of his/her family.

Similarly, at Trial 1, the government evoked bias by referring to GDC Acquisitions, LLC, which is a holding company, as a "shell" company. (T. 416:19-22). Defendant Watts moves to exclude and prevent any such prejudicial reference.

Prior to Trial 1, the Court granted in large measure the government's motion to preclude questioning of its witness, Veronica Finn ("Ms. Finn") regarding (1) her husband's position as a former agent of the FBI, the agency that investigated and still assists the government in prosecuting this case; (2) her communications with her husband regarding GDC; and (3) the government's decision not to prosecute her notwithstanding her knowledge of the alleged fraud and conspiracy and her status as an officer of the company. Defendant Watts seeks clarification of the Court's ruling regarding questioning of Ms. Finn in light of the prosecution's cross-examination of Dupree in which it asked repeatedly if he had reported to the FBI certain meetings, at which Ms. Finn was present, and certain disclosures, of which Ms. Finn was aware.

3

During the previous trial, the defendant Dupree testified and was cross-examined at length by the prosecution.  Accordingly, if Dupree should be unavailable or take an inconsistent position – by relying, for example, on his Fifth Amendment right not to testify – defendant Watts seeks to introduce in evidence the testimony Dupree gave at Trial 1.

## ARGUMENT

**I.     The Recordings Between Emilio Serrano and Frank Patello Are Inadmissible Because They Are Not Subject to the Hearsay Exception For Co-Conspirators.**

This Court previously found the recordings of conversations between Serrano and Patello admissible pursuant to Fed. R. Evid. 801(d)(2)(E).  (Dkt No. 447, pp. 38-44).  However, during Trial 1, the prosecution elicited testimony and made arguments to the jury that contradict some of the factual assumptions on which the Court's pretrial ruling was based, and, therefore form the basis for Mr. Watts' motion seeking to preclude admission of those recordings.  Specifically, the government introduced testimony and repeatedly argued with great emphasis to the jury that Patello withdrew from the conspiracy in March 2010, several months before Serrano recorded telephone conversations with him.   The government should not be permitted to argue one way to the jury and another way to this Court.

Under Fed. R. Evid. 801(d)(2)(E), a hearsay statement "made by the party's coconspirator during and in furtherance of the conspiracy" is admissible as non-hearsay.  A statement is not made during the course of a conspiracy if it is "made after the main objective of the conspiracy has been accomplished."  *See United States v. Lombardozzi,* No. S1 02 CR 273, 2003 WL 1956290 at *2 (S.D.N.Y. Apr. 24, 2003) (citing *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716 (1949)).  Moreover, for a statement to be made in furtherance of the conspiracy, it cannot be "idle chatter," "entirely retrospective," or a "mere narrative description by one coconspirator of the acts of another."  *See United States v. Lieberman*, 637 F.2d 95, 102-103 (2d Cir. 1980); *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990)

4

(quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989).

Statements about the past are in furtherance of the conspiracy only if they serve some current

purpose in the conspiracy, such as to promote cohesiveness, or to provide reassurance to a co-

conspirator. *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir.), *cert denied*, 500 U.S. 919

(1991); *Lombardozzi*, 2003 WL 1956290 at *1. To be deemed "in furtherance of the

conspiracy", a "statement must be ... [intended] to prompt the listener … to respond in a way that

promotes or facilitates the carrying out of the criminal activity." *Maldonado-Rivera*, 922 F.2d at

958. Here, as shown below, the telephone conversations Serrano recorded with Patello do not

meet these requisite standards for admissibility based on furthering the conspiracy.

It is well established that "once a party withdraws from a conspiracy subsequent

statements by a coconspirator do not fall within this exemption." *United States v. Nerlinger*, 862

F.2d 967, 974 (2d Cir. 1988)(citing 4 Weinstein's Evidence ¶ 801(d)(2)(E)[01], at 801-248-49

(1988)). "'Withdrawal from a conspiracy requires 'affirmative action … to disavow or defeat

the purpose' of the conspiracy'" *Nerlinger*, 862 F.2d at 974 (quoting *United States v. James,* 609

F.2d 36, 41 (2d Cir. 1979), *cert denied*, 445 U.S. 905, 100 S.Ct. 1082 (1980)).[2]

Here, the recordings of Serrano and Patello were not made during the course of or in

furtherance of a conspiracy since neither communicant could legally be deemed a member of a

conspiracy at the time of the recorded conversations in May and June 2010. One communicant,

Serrano, had become a government agent, and therefore, as a matter of law, could not be a

conspirator. *United States v. Goldberg*, 756 F.2d 949, 958 (2d Cir. 1985). The other, Patello, had

withdrawn from any purported conspiracy. Prior to Trial 1, the Court admitted the recordings on

the basis that there was "no showing that [Patello] performed an affirmative act to withdraw

from the conspiracy." (Dkt No. 447, p 40). At trial, however, the government elicited testimony

---

[2] On Nov. 6, 2012, the Supreme Court heard argument in *Smith v. United States*, 11-8976, on the issue of whether the Government has the burden of proof of withdrawal from a conspiracy.

and made arguments to the jury that did make such a showing.  It vigorously maintained that when Patello left GDC in March 2010, he withdrew from the conspiracy.

During the trial, the government questioned Patello about a letter he wrote to Dupree, dated March 12, 2012 (GX-251).  In the letter, Patello stated that he could

> not participate in either the meeting on the 17th … scheduled with Amalgamated to review … [the] 2009 preliminary results and 2010 budget, nor the scheduled audit to be conducted by JH Cohn starting 4/1/10 or the bank field exam to be conducted latter [*sic*] in April, unless we have resolved the ... financial reporting issues.

Patello testified that this letter was an affirmative step, stating that it was "[i]n essence … my resignation.  I was resigning from the company ... I was leaving." (T. 2504:9-12).  In short, he portrayed the letter – as well as his meetings with Dupree – as an affirmative act of withdrawal from the alleged conspiracy.  Patello further testified that a few days later, he met again with Dupree and engaged in an additional affirmative act of withdrawal by refusing to act cooperatively.  He testified that he affirmatively stated the following to his employer, Dupree:

> I could not move forward without a restatement.  That [the] relationship was just not repairable…. I wouldn't be cooperative.  I believe he [Dupree] asked me, what does that mean?  I said, I will not help you or cooperate with you in any way.

(T. 2506:6-8;11-16).  Patello's own testimony, therefore, supports the argument that he engaged in affirmative acts evidencing his withdrawal from the alleged conspiracy in March 2010 first by resigning from GDC and its subsidiaries and then by refusing to be cooperative.  *See United States v. Greenfield*, 44 F.3d 1141, 1149-50 (2d Cir. 1995) (holding if defendant explained to co-conspirator that he no longer wished to be part of the conspiracy, such action was sufficient to establish withdrawal from conspiracy); *Nerlinger*, 862 F.2d at 974-5 (finding that by resigning, defendant "unquestionably disavowed the conspiracy" and his act of closing an account that held the monetary gains of the fraud constituted "an explicit withdrawal from the conspiracy").

The government bolstered Patello's testimony about withdrawal by introducing hearsay to which Serrano testified on the stand   (T. 715:2-18).

Q.    Did Patello ever tell you why he left?
A.    Yes.
Q.    Did his explanation have anything to do with his personal health?
A.    No, it did not.
Q.    Did it have anything to do with his wife's personal health?
A.    No, it did not.
Q.    When you had this conversation with Patello, was it while he was in the process of leaving, or was it after he left?
A.    I had conversations with him before he left and after he left.
Q.    Okay.   When he explained why he was leaving in the earlier conversations, what was his explanation to you?
A.    That he was not agreeing to the financial statements and that he was just leaving the company because he disagreed with Rodney Watts and Courtney Dupree about that.

During both its opening and rebuttal summations, the government argued strenuously that Patello withdrew from the conspiracy. AUSA Yaeger argued that Patello showed an affirmative act of withdrawal because he "leaves and *shows he means it*."  (T. 3446:12; emphasis added). He further asserted that, after Patello refused to go to the March meeting with Amalgamated Bank and either resigned or was fired, he was "*not ... on board anymore*".   (T. 4065:16-19; emphasis added).  AUSA Woll, in rebuttal summation, expanded further on the same theme and explicitly acknowledged that Patello withdrew from the alleged conspiracy when he twice argued that Patello "*walked away*" not only from his job at GDC and its subsidiaries but also "*from the fraud*". ( T. 4218:12) ("So Mr. Patello left.  He quit his job.  He walked away from this salary that was motivating him."); (T. 4216:9-10; 19-20) (" Patello, Nusfaumer and Serrano all said, *enough, enough*.  Each one of them *walked away from the fraud*. … Patello had had enough by March 2010. You heard him say that he just could not lie anymore.")  (Emphasis added).

In sum, since both prosecutors vigorously argued at trial that Patello withdrew from the conspiracy in March 2010, the government can no longer maintain the position it argued prior to

7

trial: namely, that Patello had not affirmatively taken steps to withdraw before he was taped months later by Serrano.  Accordingly, those tapes should be excluded.

Furthermore, the comments that Serrano, as a government agent, elicited from Patello following the latter's withdrawal from the alleged conspiracy, are nothing more than "narratives" of past events and "idle chatter" about the atmosphere at GDC.  Patello's recorded conversations with Serrano did not seek to "promote[] or facilitate[] the carrying out of the criminal activity." *Maldonado-Rivera*, 922 F.2d at 958.  In fact, Patello encouraged Serrano to do just the opposite. During the conversation recorded on May 17, 2010, Patello advised Serrano *not* to do anything improper.  He told Serrano to "keep your nose clean … get yourself another job" and  "don't let your hands get sullied."  (Transcript, Recording 2-1).  Patello actually encouraged Serrano to leave GDC and not continue with the alleged conspiracy; he even disavowed the alleged conspiracy by telling Serrano how "stupid" he was for taking part in it.  *Id.*

To the extent Patello made any statements or took any action to conceal the conspiracy after he withdrew, such statements or action do not justify admitting in evidence the recordings Serrano made of Patello. *Krulewitch v. United States*, 336 U.S. 440, 444, 69 S.Ct. 716, 718 (1949) (refusing to expand the narrow exception of Fed. R. Evid. 801(d)(2)(E) to admit a declaration not made in furtherance of the alleged conspiracy, but made in "furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment.")

Accordingly, since the government's arguments and the testimony of its witnesses at Trial 1 show that Serrano recorded his conversations with Patello *after* the latter withdrew from the alleged conspiracy, the recordings are inadmissible hearsay and should be excluded.[3]

---

[3] In the event the Court denies this motion, defendant Watts respectfully requests that portions of the recordings that contain discussions of the illness of Patello's wife be excluded.  *See* Point III *infra*.

**II.      The Recordings Made By Serrano Are Inadmissible Where the Government Failed to Preserve and Identify the Documents Referred to in the Recordings.**

The government should be precluded from introducing in evidence recordings made by Serrano in which participants discuss documents that the government has failed to identify and preserve.  Alternatively, the Court should provide an adverse inference instruction to the jury.

In this case, an informant, Emilio Serrano, was deployed by the FBI on at least 21 separate days during which time, he made over 44 recordings.  The vast majority of those tapes are recordings of conversations with Rodney Watts, and most of those recorded conversations are keyed to documents under discussion.  However, the defense does not, to its knowledge, have many of the documents discussed on the recordings, including documents the government claims defendant altered.  Defense counsel has asked several times, in writing, for any and all such documents to be identified and produced.  The prosecution, however, has not responded to any of these requests.  (*See* Bachrach Aff., Exs. A, B).[4]  Nor did the prosecution produce as exhibits or Jencks Act material for Trial 1 any log entries, forms or reports showing chain of custody of the recordings or of any documents given to the agents by Serrano in connection with the recordings.  In light of the government's failure to respond to the defense's requests, which pointedly noted the need for advance notice in order to comply with the Court's schedule for filing motions in limine, this section of the memorandum is written on the assumption that the missing documents were not preserved.  To the extent the government disputes the facts, an evidentiary hearing may be necessary and is hereby requested.

It would appear that the FBI allowed Serrano to operate without real supervision.  It seems that no agent stayed within listening distance of the recording location in order to monitor Serrano's conversations or to receive and safeguard each recording directly after it was made.  It

---

[4] The comparatively small number of documents that the defense assumes might be connected to the recorded discussions are those it has located among the millions of emails produced; they are not original documents initialed by Serrano or the case agent, nor have they been identified by the prosecution as connected to the recorded discussions.

also appears that, notwithstanding the fact that Serrano repeatedly recorded conversations about documents with complex facts and figures, he did not provide the FBI with the originals or photocopies of documents he discussed. This lacuna makes many of the conversations unintelligible and prevents Mr. Watts from mounting a full defense regarding the content and context of the conversations.  Several examples may help:

- In a recorded conversation on May 18, 2010, marked as 3-6, Serrano begins the conversation as follows. "One last thing, sorry, I just didn't ... in um ... in JDC and then HBE, in current I had three here, and five here, makes it eight.   What number did you want me to make it for current?  Cause I know you didn't want me to go all the way to 12."  Neither the defense nor the jury could have any idea what document is being referenced, or if it is or is not accurate.

- Later in the same recording, when Mr. Watts repeats an earlier instruction that Serrano do billing, Serrano responds: "Cause I'm trying to match your thing, no?" Mr. Watts tells him: "No you don't have to match it" and the conversation continues, but, without a document, the listener is left to surmise and  Mr. Watts would have no way to counter Serrano's after-the-fact testimony

- In a recorded conversation on May 19, 2010, marked as 4-1, Serrano tells Messrs. Dupree and Watts that he is "short". Both defendants say that cannot be the case and ask about backlog.  Mr. Watts specifically asks Serrano to "print the list of the backlog out that you're billing from."  He answers: "OK", but the defense has no such document as of the date of May 19, 2010.

- In a recorded conversation on May 20, 2010, marked as 6-2, Serrano enters Mr. Watts' office with documents, saying "All the summaries are behind there" and then discusses moving certain numbers. Mr. Watts asks about different numbers: "What is this number?" Serrano answers that "this" is "eligible receivables", but later, when asked if he performed cross-

aging, admits he did not perform that calculation.  The jury – and defense counsel – would have no basis for understanding what numbers (or document) Serrano is pointing out, and his statement that the (not visible) numbers on the (not visible) document reflect eligible receivables is not correct, without proper calculations for cross-aging.  In short, without the document, the recording cannot be properly understood, and Serrano cannot be properly cross-examined.

- At another point on the same recording, Serrano points to backlog "This here is the backlog of stuff I can bill in HBE."  Although the issue of what constituted backlog was disputed at the last trial, the backlog document in this recording has not been identified and does not appear to have been preserved.

- In a recorded conversation on May 20th, marked as 6-5, Mr. Watts tells Serrano to preserve billing:

> Serrano:  We don't need to keep all this billing do we?
> Watts:  The invoices?
> Serrano:  Yeah.
> Watts:  Keep them. ... Put them in a box, mark it clearly.

Notwithstanding Mr. Watts' directive, the billing documents mentioned have not been identified and do not appear to have been preserved.

- On a June 2, 2010 recording, marked as 8-3, Serrano and Mr. Watts discuss documents:

> Watts:  [W]here are the vendor invoices? ... What I don't have, just to be clear, is everything in red ... Stuff in red, I don't have.... That's what I'm asking about.
> Serrano:  I, I have a bunch of them. I will put them together and bring them to you.
> Watts:  Alright, So go get that stuff and bring it here.

The "bunch" of vendor invoices that Serrano said he would put together and bring to Watts have not been identified and appear not to have been preserved.

- On another recording on June 2nd, marked as 8-5, Mr. Watts and Serrano discuss a number of documents, none of which have been identified.   After discussing invoices Serrano pulled that are, presumably, in front of the speakers, Serrano states: "I created over $300K of A/P invoices that … I gave to the A/P clerks not to pay".   Those documents have not been identified or provided.

Serrano and Watts then discuss other invoices before them, and Mr. Watts requests copies of "checks and remittance advice" documents, which Serrano agrees to provide.  None of those documents have been identified or provided.

- In a conversation on June 4, 2010, marked as 10-1 – 10-4, Mr. Watts asks Serrano to bring him "a copy of the paperwork, the check … Whatever agreement we have with them … Email of whatever it is, there was some agreement that was signed … the manner in which we will handle it …. I want it all.  Copy of all of it."  No such copies have been identified or provided.

- In another conversation on June 4th, marked as 10-6, Serrano and Mr. Watts comb through a request from the accountants and discuss various sections; their discussion is incomprehensible without the exact pages from document.  (E.g., "This would be the same … #1 and #2."  "Yeah, it's … all the same." "Now what did we do for #3?")

- On a recording on June 10, 2010, marked as 12-1, Serrano offers to get Mr. Watts the "invoices so that you can change them?  The AP invoices."  But no such copies – changed or unchanged – have been identified or provided.

- On a recording on June 15, 2010, marked as 12-7 (emphasis added below), Serrano and Mr. Watts start the meeting looking at a document:

> Watts: All of the [stuff] in red has to be accounted for.
> Serrano: These ones are Hunter Roberts
>                        ***

12

> Serrano: That's why the confirmation was so important because then you get rid of all of *those, this, this and this*.

Without a document, the conversation is partly unintelligible. Then Serrano asks Mr. Watts a question that goes to the heart of the case:

> Serrano: How are you changing documents, through PDF or making up new, um …
> Watts: Which documents?
> Serrano: The Hunter documents
> Watts: Manual

The government will likely claim this conversation shows defendant altered documents, but it has not identified any such documents despite defense requests.

There are other recordings where the participants are reading from or referring to documents (*see e.g.*, 12-5, 15-1, 14-1, 16-1 – 16-2, 16-3 -16-4, 16-5, 16-6). In sum, nearly all of the recordings Serrano made with defendant Watts involved discussion of specific documents that have not be identified as preserved.

Under Fed. R. Crim. P 16(a), the government is obligated to produce to the defendant all written or recorded statements by the defendant where such is within the government's custody and control as well as all documents material to the defense, or intended for use in the government's case in chief, or obtained from the defendant, *See also United States v. Rigas*, 258 F.Supp.2d 299, 306 (S.D.N.Y. 2003) (Rule 16(a) "entitles a defendant to documents or other items that are material to preparing argument in response to the prosecution's case in chief"). Thus, under various provisions of Rule 16, the defendant is entitled to have identified and produced all documents that were the subject of the tape-recorded conversations with Serrano.

If the government does not have copies of the documents discussed on the tapes, that is due to its failure to supervise Serrano. Here, proper supervision clearly required an instruction that Serrano give the agent the original or a photocopy (or computer print-out) of each document discussed. Those documents typically would be initialed by the agent, just as Agent Shea

13

initialed certain emails and other documents from GDC and its subsidiaries that Serrano did give

the FBI.  Such an instruction should have been given at the outset where, as here, the whole point

of the recordings was to have Serrano discuss particular documents with Mr. Watts.  Further, the

tapes themselves,  over the course of 21 days and dozens of recordings, showed a clear need for

instruction by the FBI to keep and preserve originals and/or copies of the documents discussed.

The failure to identify and preserve documents discussed and purportedly altered makes the

recordings incomplete and constitutes a failure to preserve and produce key documents.

The Second Circuit takes a case-by-case approach when presented with the issue of

failure to preserve and produce relevant documents, and it does not require that remediation be

based on a finding of bad faith or intentional misconduct.  *Reilly v. Natwest Markets Group Inc.*,

181 F.3d 253, 267-68 (2d Cir. 1999) (upholding adverse influence instruction where plaintiff

demonstrated at trial, untimely and incomplete production, among other things).  Where relevant

documents clearly existed but have not been – or cannot be – produced, the word typically used

is "spoliation", even where the lack of documentation is not the result of bad faith or intentional

wrongdoing.  Spoliation is the failure to preserve property for another's use as evidence in

pending or reasonably foreseeable litigation.  *Liberman v. Fedex Ground Package System Inc.*,

09 CV 2423 (RML), 2011 U.S. Dist. LEXIS 4401 (E.D.N.Y. Jan. 18, 2011).

A defendant seeking remedial relief due to spoliation must establish (1) that the opposing

party had control over the evidence and an obligation to preserve it at the time it was destroyed;

(2) that the records are unavailable due to negligence, gross negligence or intentional behavior;

and (3) that the unavailable evidence was "relevant".  *See Residential Funding Corp. v.*

*DeGeorge Financial Corp.*, 306 F.3d 99, 107-108 (2d Cir. 2002) (internal citations omitted);

*Liberman, supra*, 2011 U.S. Dist. LEXIS 4401.

Here, the FBI clearly anticipated litigation – that is the reason why it had its informant

tape-record conversations.  Since litigation was reasonably foreseeable and the taping was part of

14

an effort to record evidence, it had an obligation to preserve all the relevant evidence, including the documents discussed on the tapes. Moreover, Serrano's repeated discussions of documents on the various recordings made clear those documents under discussion were relevant to the case. Notwithstanding this clear need, the government failed to preserve and identify these documents. By letter dated October 23, 2012, counsel for Mr. Watts wrote to Mr. Yaeger to request that the government identify, by bates number and/or exhibit number from Trial 1, all documents which are discussed or referred to in any of the conversations recorded by Serrano. Mr. Yaeger has not responded to this request to date. Presumably, the government is unable to do so because the FBI and Serrano failed to preserve these documents.

If the government failed to preserve those documents, that failure constitutes, at a minimum, negligence. However, an element of gross negligence, or worse, although not necessary under the law of the Second Circuit, is not impossible to infer. The FBI failed to supervise its informant and properly generate logs and reports or gather written information being discussed on the tapes. *Cf., Guccione v. United States*, 85 CV. 0333(CBM), 1987 U.S. Dist. LEXIS 8262 at *24 (S.D.N.Y. Sept. 10, 1987) (Abscam informant described as "unguided missile for the FBI" because in "flagrant violation of the bureau's own rules for the handling of informants", which "require FBI agents to keep a constant, careful record of what its informants do or say as they pursue their prey", agents kept "few, if any, written records.") Here, although the FBI had repeated notice of the need to preserve the documents discussed on the tapes gave, it apparently failed to do so.

The government made similar mistakes in *United States v. Suarez*, No. 09-032 (JLL), 2010 WL 4226524 (D.N.J. Oct. 21, 2010). There, the FBI used a cooperating witness to investigate public corruption in New Jersey. The cooperating witness spoke and met with the defendants on multiple occasions. During the investigation and while meeting with defendants, the witness exchanged many text messages with the agents. *Id.* at * 1. Despite repeated

15

requests from the defendants, the government failed to produce those text messages and later revealed that the FBI agents had deleted the messages.

The *Suarez* court found that the government had failed to follow its own "litigation hold" policy and had shown gross negligence in failing to preserve Jencks Act material relevant to test the credibility of a cooperating witness. It found that the unavailable evidence was not only relevant but foreseeably so. Although the court denied defendants' request to suppress the evidence relating to the cooperating witness, it found remedial action necessary and ruled that the following "spoliation charge" was appropriate." *Id.* at * 10.

> During the course of this trial you have heard evidence by way of stipulation and testimony that during the Government's investigation of Defendants, the cooperating witness … exchanged numerous text messages with F.B.I. agents supervising the investigation. The Government was obligated to preserve all of these text messages, but they were either deleted by the agents themselves or not preserved by the Government …. You may infer from the Government's failure to preserve these messages, or the fact that they were deleted by agents, that the missing text messages were relevant to this case and that they were favorable to both [Defendants]. You are not required to make this inference, however, and you must consider any rebuttal evidence that has been offered by the Government with regard to this issue. Whether you ultimately choose to make the inference is your decision as the finder of fact.

In addition to *Suarez*, decisions by Judge Scheindlin concerning spoliation in civil cases also bear consideration. *See Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422 (S.D.N.Y. 2004) and *Pension Committee Of the Univ. of Montreal Pension Plan v. Banc of Am. Secs, LLC*, 05 CV. 9016 (SAS), 2010 U.S. Dist. Lexis 4546 (S.D.N.Y. Jan. 15, 2010). In those civil cases, the court imposed sanctions when a party failed to take the necessary steps to preserve relevant documents. In *Zubulake*, the court permitted an adverse inference instruction and directed the defendant to pay monetary sanctions for failing to preserve and maintain relevant discoverable documents following receipt of a litigation-hold notice from its counsel. In its subsequent

decision in *Pension Committee*, the court again permitted an adverse inference instruction and levied sanctions for failure to preserve documents when litigation was anticipated.

These decisions evidence a zero-tolerance policy for parties who are negligent in preserving and producing relevant documents in the context of a foreseeable civil action. The standard in a criminal case should be at least as strong, if not stronger. The government taped Mr. Watts anticipating that recorded conversations about documents would be important to the prosecution and relevant to Mr. Watts' defense. The government had a duty to preserve the documents that were discussed, and purportedly altered, and identify them to Mr. Watts. So far, the government has failed to do so. If the reason stems from the fact that it cannot do so, the recordings made by Serrano should be excluded in order to fully counterbalance the prejudicial effect of the government's gross negligence. Alternatively, the Court should permit an adverse inference instruction to the jury.

There is an additional legal basis for excluding the recordings: they are incomplete under Fed. R. Evid. 106. Rule 106 provides, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time." Inherent in Rule 106 "is a principle of fairness requiring the introduction of an entire or related document if necessary for the 'fair and impartial understanding of the admitted portion' or document." *Phoenix Assoc. III v. Stone*, 60 F.3d 95, 102 (2d Cir. 1995) (internal citations omitted). In *Phoenix*, the defendant offered into evidence financial statements evidencing plaintiffs' ownership interest in a partnership. The plaintiff, in turn, sought to introduce the work papers that were relied upon in the preparation of the financial statements. The Second Circuit held that the work papers were admissible in the interest of completeness, stating: "[w]ithout the work papers … it [would be] impossible to determine how the financial statements derived th[e] [net equity] value." *Id.* Rule 106 requires that documents be admitted when they are "essential

17

to explain" already admitted evidence, to "place … in context" admitted evidence, "or to avoid misleading the trier of fact." *Id.*

Here, as in *Phoenix*, the documents discussed in the recordings are needed in order to give context and a "fair and impartial understanding" of the recorded conversations.  If the government failed to preserve those documents, the recordings should be excluded.

### III.    The Court Should Preclude Direct or Cross-Examination Testimony Concerning Any Illness, Medical Diagnosis or Other Ailment Afflicting a Witness or Members of the Witness' Family.

During the trial of Dupree and Foley, Veronica Finn testified as to certain medical conditions afflicting family members of Serrano and Irma Nusfaumer.  The government then relied upon such testimony in its rebuttal summation as the basis for why Serrano, Nusfaumer and Patello all participated in the alleged conspiracy.  Such testimony was not material to the government's case and was elicited to garner sympathy for the government's witnesses while prejudicing the jury against the defendants.  Therefore, the government should be precluded from following this same line of questioning during the trial of Mr. Watts.

Pursuant to Fed. R. Evid. 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger … of unfair prejudice."  Undue prejudice is defined by the "Advisory Committee Notes to Rule 403 … as an 'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  *United States. v. Salim*, 189 F.Supp.2d 93, 98 (S.D.N.Y. 2002) (quoting the Advisory Committee Notes).  As the court in *United States v. Paccione* found, "[i]t [is] well within the court's discretion to draw the line to exclude testimony that … could well cause the jury to be influenced by sympathies having no bearing on the merits of the case."  949 F.2d 1183, 1201 (2d Cir. 1991) (excluding testimony in a fraud case that defendant's teenage son was born with cerebral palsy).

With regard to Serrano, Ms. Finn previously testified as follows:

Q.    Why did he [Serrano] need health insurance?

> A.      He had a daughter who had undergone an amputation, a leg amputation, earlier that year, and he had extensive health bills.

(T.1724:17-20).  As to Ms. Nusfaumer, she testified:

> Q.      Do you recall that conversation shortly before she left the company?
> A.      She was very upset because she felt that she had to leave; that she didn't have a choice, but she didn't have another job.  She asked if she got something I would give her a reference.  She was worried about losing her health insurance.  She had two autistic children, and she couldn't afford to be without health insurance ….

(T. 1728:9-15).  The purpose of this testimony by Ms. Finn was to bolster the testimony of the two cooperating witnesses by providing sympathy.

In its rebuttal summation, the government argued: "Having a job is a very important thing for all of us.  It was particularly important for Patello and Nusfaumer and Serrano because all three of them had had family members who were ill or in need of medical care."  (T. 4215:25-4216:3).

The undue prejudicial effect of Ms. Finn's testimony, as well as the government's reliance in its rebuttal summation upon the ill health of the three witnesses who had pleaded guilty with a cooperation agreement – family members of Patello, Nusfaumer and Serrano – overwhelmingly outweighed any potential probative value.  The government referred to such matters in order to evoke the sympathy of the jurors.  Accordingly, the Court should preclude testimony and argument concerning any illness, medical diagnosis or other ailment or misfortune afflicting a witness or member of the witness's family.

**IV.    The Court Should Prohibit the Government from Referring to or Identifying GDC as a "Shell" Company.**

Serrano testified that GDC was a "shell for other subsidiaries."  (T. 416:19-22).  The term "shell" company is both pejorative and unduly prejudicial.  A "shell" entity connotes a sham company without substance.  It evokes an entity created for an improper or illegal purpose,

which is not a legitimate business. *See United States v. Ross,* 77 F.3d 1525, 1535-36 (7th Cir. 1996)(characterizing a corporation created solely to evade bankruptcy rules and to commit mail and wire fraud as a "shell corporation"). Therefore, pursuant to Fed. R. Evid. 403, the government and all witnesses should be prohibited from referring to GDC as a "shell" company.

**V.      Given the Government's Cross-Examination of Dupree, Defendant Watts Seeks Clarification About Cross-Examining Veronica Finn Regarding Her Husband's Former Position as an FBI Agent, Her Non-Privileged Communications With Him, and the Government's Decision Not to Charge Her.**

Prior to Trial 1, the Court ruled on the government's request to preclude the defendants from: (1) questioning Ms. Finn regarding the government's decision not to charge her in the alleged conspiracy; and (2) questioning her regarding her connection to the FBI. *United States v. Dupree*, 833 F.Supp.2d 255, 266 (E.D.N.Y. 2011). Although the Court permitted cross-examination of Ms. Finn concerning her husband's "position and his relationship to the case, if any, to reveal any possible biases or motives that may affect [her] testimony," the Court precluded "any questioning suggesting that, *because of Mr. Finn*, the United States Attorney's Office treated Ms. Finn favorably in deciding not to charge her at this time." *Dupree*, 833 F.Supp.2d at 268 (emphasis in original). In light of testimony elicited at Trial 1, the government's line of cross-examination of Mr. Dupree, and a recent decision of the Second Circuit, Mr. Watts respectfully requests that the Court further clarify its ruling.

During its cross-examination of Dupree, the government repeatedly questioned Dupree on whether he contacted the FBI following Patello's March 10, 2010 disclosure of fraudulent financial reporting at GDC. Regarding each purported issue of wrongdoing of which he was purportedly made aware, the prosecution asked, much like a refrain, "Did you call the police? Did you tell the FBI?" (*See e.g.*, T.3723:9; 3734:10; 3796:14-18; 3802:23-25; 3823:19).

The testimony of Patello, Serrano and Finn revealed that Veronica Finn was also aware of the alleged financial reporting fraud. Patello testified that Ms. Finn was present at the March

20

10th meeting and did not express "shock" at his revelations. (T. 2557:20-2559:6). Serrano testified that he also discussed with Ms. Finn his concerns about the financial reporting fraud as early as 2009:

> A. I now understood that I was committing fraud by doing all these lies for the company.
> Q. Now, did you know before that you were lying?
> A. Yes. I just didn't think it was as bad.
> Q. So, when this happened, after this happened – and this is late 2009 – did you confide in anyone else at GDC about your views of what you had done?
> A. Yes, I did.
> Q. Who did you confide in?
> A. I had confided in – to Mrs. Ronnie Finn. I had talked to Frank Patello about it. And I talked to a gentleman, Mr. Donald Carr.
> Q. Okay. What did you say to Ms. Finn?
> A. I just told her of my concerns about what we were doing and how it was starting to become out of hand. It was getting to be, you know, much more than just trying to keep the business afloat.

(T. 638:1-17). During cross-examination, Serrano further testified as follows:

> Q. Tell the Members of the Jury again who Ronnie Finn is?
> A. She is the HR director. She also was like the office manager.
> Q. Okay. And is she a, an officer of GDC?
> A. I believe so.
> Q. One of five?
> A. I'm sorry?
> Q. One of the five officers?
> A. Yes.
> Q. Okay. You said that you had a conversation with her before you went to the FBI; is that correct?
> A. Yes, I did.
> Q. Can you tell the Members of the Jury what the conversation was about?
> A. It was just our concerns about the pre-billing and I discussed it with her and she just told me that she had been discussing it with Mr. Dupree and Mr. Watts and Mr. Thomas Foley.
> Q. And she had had all the same discussions?
> A. I believe so.
> Q. And did you have any other conversations with her?
> A. I had many conversations with her.

(T.1101:16-1102:12).

Ms. Finn, likewise, testified as to her knowledge of Patello's account of fraud:

> Q.    Okay.  And after this you arranged a meeting?
> A.    I did.
> Q.    Approximately when did that meeting take place?
> A.    I believe it was early March of 2010
>                             ***
> Q.    Who was at that meeting?
> A.    Thomas Foley, myself, Frank Patello, Courtney Dupree, and Rodney Watts.
> Q.    Patello talked at that meeting?
>                             ***
> A.    Yes, he did.
> Q.    Did he talk about accounting?
> A.    He did.
> Q.    What did he say about accounting?
> A.    He said that there had been – there were irregularities on our accounts receivable that included three levels of misinformation.  The first one being prebilling, the second being renaming, and the third being totally fictitious sales that had been put onto the accounting system.

(T.1706:21-1707:20).

Given this testimony at the earlier trial, defendant Watts is entitled to ask the government's witness, Ms. Finn – just as the government inquired of Courtney Dupree, when he was a witness and it cross-examined him during Trial 1 – whether, despite having direct knowledge of the alleged fraud at GDC, Ms. Finn notified the FBI or any law enforcement official or entity.  That line of questioning is all the more pertinent on cross-examination of Ms. Finn, inasmuch as her husband was a retired FBI agent.  Furthermore, Mr. Watts' right to fully and properly cross-examine Ms. Finn is secured by constitutional rights: his Fifth and Sixth Amendment rights to present a defense at a fair trial and his Sixth Amendment right to confront and fully cross-examine witnesses, particularly on issues of potential credibility and bias.  As noted by the Supreme Court, "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility.

To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination …." On *Lee v. United States*, 343 U.S. 747, 757, 72 S.Ct. 967, 973 (1952). *See also Banks v. Dretke*, 540 U.S. 668, 701, 124 S.Ct. 1256, 1278 (2004) (same).

This line of questioning should not involve communications protected by the spousal communications privilege. *See Dupree*, 833 F.Supp.2d at 268. Where "marital communications" are not intended to be confidential, the spousal communications privilege does not apply. *Merlin v. Aetna Life Ins. Co.*, 180 F.Supp. 90 (S.D.N.Y. 1960). Here, the questioning will not concern confidential communications but whether Ms. Finn played a role in alerting law enforcement to issues of purported fraud – either through her husband or anyone else.

Questions concerning the government's favorable treatment of Ms. Finn, and its ultimate decision not to charge her are equally appropriate areas for cross-examination. Ms. Finn was one of five officers at GDC and the only one not charged in this case, notwithstanding her former position as Comptroller and her direct knowledge of the alleged fraud at GDC. *Dupree*, *supra*, 833 F.Supp.2d at 266-67. Also, someone – presumably from the FBI – crossed out the name of Ms. Finn on the office chart used by the FBI on the day it searched the GDC offices. (*See* Exhibit D to Bachrach Declaration). The twin issues of whether she reported the crime – through her husband or otherwise – and the government's choice to exempt her from prosecution (as well as to protect her identity during the search) are properly the subject of cross-examination. As the Second Circuit found in *United States v. White*, 692 F.3d 235, 245-46 (2d Cir. 2012), "[i]n a criminal case '[t]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged.' … While such evidence 'may be excluded where it does not sufficiently connect the other person to the crime,' it cannot be said that evidence of the Government's charging decisions, in *all* cases, 'is speculative or remote, or does not tend to prove or disprove a material fact in issue at … trial.'" (Internal citations omitted; emphasis in original). Here, both Ms. Finn and Mr. Watts are said to

23

have had direct knowledge of the alleged fraud at GDC. To the extent Ms. Finn was not charged in the conspiracy, Mr. Watts is entitled to inquire into that issue, on cross-examination of Ms. Finn and other witnesses.

### VI.    The Testimony of Dupree Should Be Admitted Into Evidence.

Dupree testified at Trial 1, and was subject to vigorous cross-examination by the prosecution.  If Mr. Dupree should be unavailable for any reason, including assertion of his Fifth Amendment right against self-incrimination, his testimony should be admitted into evidence under either or both Fed. R. Evid. 804(b) and 801((d)(1)(A).

Rule 804 provides that where a declarant is exempted from testifying on the grounds of privilege, his testimony at a prior proceeding may be offered against a party that had the opportunity and "similar motive" to develop it by direct, cross or redirect examination.   It is well established that where a witness invokes a valid privilege under the Fifth Amendment, he is unavailable within the meaning of Rule 804(a)(1) and thereby renders applicable the hearsay exception in 804(b). *United States v. Bahadar*, 954 F.2d 821, 828 (2d Cir. 1992); *United States v. Rodriguez*, 706 F.2d 31, 40 (2d Cir. 1983)(same); *United States  v. Beltempo*, 675 F.2d 472, 480 (2d Cir. 1982) (same).

A valid Fifth Amendment privilege is grounded on a reasonable fear of danger of prosecution.  *Rodriguez*, *supra*, 706 F.2d at 36, *citing Hoffman v. United States¸* 341 U.S. 479, 485-86 (1951) and *Rogers v. United States*, 340 U.S. 367, 372-73 (1951).  The privilege extends not only to disclosures that would in themselves support a conviction but also to those which would "furnish a link in the chain of evidence needed to prosecute the claimant …." *Id. (citing Hoffman, supra,* 341 U.S. at 486).

Although Mr. Dupree waived his Fifth Amendment privilege at his own trial, testifying fully both on direct and cross-examination, he may elect to assert that privilege if called as a witness in the upcoming trial against Mr. Watts.  It is well established that waiver of the Fifth

24

Amendment privilege in one proceeding does not bar the witness from asserting that right in a different proceeding where the witness faces a real risk of prosecution on other charges or legitimately seeks to avoid further federal or state charges and is therefore entitled to assert the privilege. *See United States v. Rodriguez*, *supra,* 706 F.2d at 36-37; *United States v. Miranti*, 253 F.2d 135, 139 (2d Cir. 1958) ("it is well established that a waiver of the privilege in one proceeding does not affect the rights of a witness or the accused in another independent proceeding.").

*Rodriguez* is instructive. There, the witness had entered an *Alford* guilty plea to interstate prostitution and income tax evasion, thereby waiving her Fifth Amendment right with respect to those charges. *Rodriguez*, 706 F.2d at 34, n.1. When she was called as a witness in the trial of her alleged co-conspirator, her attorney indicated that she intended to assert her privilege against self-incrimination. *Id*. at 35. Although she had previously waived that privilege with respect to the charges she faced as a defendant, the court allowed her to assert the privilege as a witness in her co-conspirator's trial on the ground that "the Fifth Amendment privilege is not lost after a witness has pleaded guilty if the witness is still subject to a realistic risk of incrimination on other charges, or if the desired testimony about the transaction in question would give rise to a risk of incrimination in connection with other transactions." *Id*. at 36-37. Noting that the witness was subject to a continued grand jury investigation, which provided "'real' and not merely trifling or imaginary hazards of incrimination," the court found the potential for additional charges resulting from the grand jury investigation presented sufficient risk for incrimination, distinct from the charges to which she had previously pleaded guilty, to make valid her assertion of the privilege. *Id*. at 36-37 (citations omitted).

Mr. Watts submits this motion in limine out of concern that, at his upcoming trial, Dupree may assert his Fifth Amendment privilege for a number of reasons. First, this is a different, independent proceeding from the one in which Dupree testified, and Dupree still faces a separate

25

charge for bank fraud, for which he has not been tried because it was severed from his prior trial. He may therefore fear testimony could incriminate him on that outstanding charge. Accordingly, he may invoke the privilege and be unavailable due to the risk of incriminating himself with respect to the pending charge on which he has not been tried.

Second, Dupree may assert the privilege out of concern that the prosecution could try to use his testimony to accuse him of perjury in Trial 1, where the jury rendered a guilty verdict. It is well established that, regardless whether a witness gives, or believes he has given, truthful testimony in a prior proceeding, he is entitled to assert the Fifth Amendment privilege if he fears that, by testifying in a later proceeding, the prosecution may charge him with perjury either in the prior or later proceeding. *In re Corrugated Container Antitrust Litig.*, 644 F.2d 70, 75 n.7 (2d Cir. 1981), *citing United States v. Housand*, 550 F.2d 818 (2d Cir. 1977); *cf., United States v. Bentvena*, 319 F.2d 916, 941 (2d Cir. 1963) (unavailability fairly established and prior testimony properly admitted where witness in subsequent proceeding refused to testify, or even enter United States, for fear of perjury charge).

The Second Circuit recently endorsed another exception to the hearsay rule that provides a basis for the introduction in evidence of Dupree's prior testimony. Where a witness who testified at a prior proceeding and was subject to cross-examination, but subsequently refuses to answer the same questions at a later trial, it deems the refusal to answer as inconsistent with the prior testimony and  regards the prior testimony as non-hearsay under Rule 801(d)(1)(A). *United States v. Truman*, 688 F.3d 129 (2d Cir. 2012).

Under Fed. R. Evid. 801(d)(1)(A), a statement is non-hearsay where the witness has testified previously under oath at a trial where he was "subject to cross-examination," and the sworn testimony from the prior proceeding is "inconsistent with the declarant's testimony." In *Truman*, the Second Circuit ruled that testimony given by the defendant's son in a related state – court trial was properly introduced into evidence when the son refused to testify at his father's

26

trial in federal court.  It held that the state-court testimony was admissible as non-hearsay because the son's refusal to answer questions in the federal trial was "inconsistent" with his earlier testimony.  688 F.3d at 142.  In so doing, it stated as follows:

> we now join all of our sister courts that have addressed the questions in holding that where, as here, a witness who testifies under oath and is subject to cross-examination in a prior state proceeding explicitly refuses to answer the same questions at trial, the refusal to answer is inconsistent with his prior testimony and the prior testimony is admissible under Rule 801(d)(1)(A).

In sum, if Mr. Dupree invokes his Fifth Amendment privilege at trial, whether out of concern over the pending charge of fraud on which he has yet to be tried or out of concern about a prosecution for perjury, the testimony he gave at Trial 1, when he was cross-examined at length by the prosecutors in the same office that will be trying the case against Mr. Watts, should be admitted into evidence under either or both Rules 804(b) and 801(d)(1)(A).

## VII.    The Indictment, With Its Long Narrative, Should Not Be Read to the Jury.

Defendant Watts respectfully requests that the Court not read to the jury the indictment in this Case, which does not simply recite the statutes that defendant Watts is alleged to have violated but is rather in the nature of a "speaking" indictment, with a prejudicial narrative written by the prosecution.  Recently, in *United States v. Esso*, 684 F.3d 347, 352, n.5, the Second Circuit wrote as follows:

> Indeed, while it is permissible … to send the indictment into the jury room, the practice is hardly mandatory, and not all trial judges follow it, particularly when the indictment does not merely state the statutory charges against the defendant, but additionally contains a running narrative of the government's version of the facts of the case,  including detailed allegations of facts not necessary for the jury to find in order to address the elements of the charged offenses.  In most cases, the judge's instructions regarding the issues to be addressed by the jury and the elements of the offenses charges, which may include a reading of the legally effective portions of the indictment, will more than suffice to apprise the jury of the charges before them.

Here, the indictment is lengthy and contains a four-page narrative of the government's view of the alleged fraud.  The government's view of the alleged fraud will be sufficiently covered in its opening statement. Accordingly, under *Esso*, defendant Watts moves that the Court advise the jury of the nature of the case by giving them the law or a neutral summary of the charges, and not read the argumentative indictment in this case.[5]

### VIII.   The Court Should Preclude The Government From Arguing or Eliciting Testimony To the Effect That Its Witnesses Pled Guilty to Conspiring With or Lying With Defendant Watts and Give A Cautionary Instruction.

At Trial 1, the government stressed that three of its witnesses  – Serrano, Patello and Irma Nusfaumer – had pleaded guilty to conspiring with and/or lying with the defendants on trial. Defendant Watts respectfully requests that the prosecution be precluded from doing so at his trial and that the jury be instructed, when each of those witnesses testifies, that it may draw no conclusion or inference about the guilt of defendant Watts from the fact that a prosecution witness pled guilty to charges similar to those Mr. Watts is facing.

In its opening statement in Trial 1, the prosecution argued:

> Now, let's be clear about something right up front.  Serrano, Patello and Nusfaumer have all committed a crime.  All of them have pled guilty to conspiring *with the defendants* to defraud the bank ….

(T. 281:25-282:3).

More subtly, but in similar fashion, the government asked the first cooperating witness questions designed to suggest that his guilty pleas were for conduct committed with the defendants.   After eliciting that Serrano had pleaded guilty to conspiracy to commit bank fraud, it asked: "When you told lies at GDC Acquisitions, who did you tell lies with?"  (T. 414:23-415:3).

It is well established that "[e]vidence of … guilty pleas is amenable to misuse." *United States v. Halbert*, 640 F.2d 1000, 1006-07 (9th Cir. 1981).  Defendant Watts respectfully moves

---

[5] Furthermore, paragraph 17 and Count Five relate solely to a severed charge against Dupree that is now on appeal.

that the prosecution be precluded from arguing in opening or closing that any of its witnesses pleaded guilty to conspiring or doing anything wrongful with Mr. Watts and that the Court instruct the jury in accordance with the language set forth in *United States v. Ramirez*, 973 F.2d 102, 104-05 (2d Cir. 1992), where the Court of Appeals held it was reversible error to refuse the following charge:

> You have heard testimony from a government witness who pled guilty to charges arising out of the same facts as this case. You are instructed that you are to draw no conclusion or inferences of any kind about the guilt of the defendant on trial from the fact that a prosecution witness pled guilty to similar charges. That witness' decision to plead guilty was a personal decision about his own guilt. It may not be used by you in any way as evidence against or unfavorable to the defendant on trial here.

*Accord,* Leonard Sand *et al, Modern Federal Jury Instructions,* Instruction 7-10 at 7-46; *United States v. Carson*, 560 F.3d 566, 574-75 (6th Cir. 2009) (well established that guilty plea of witness never admissible as evidence of defendant's guilt and becomes prejudicial error when argued by prosecution for prohibited purpose but may, with proper limiting instruction, be used to assess credibility of witness); *United States v. Binger*, 469 F.2d 275, 276 (9th Cir. 1972) (real danger – that jurors will give undue emphasis to guilty plea by witness who claims to be crime partner – may be averted by cautionary instruction that guilty plea may be considered solely to assess credibility of witness and not to prove defendant's participation in the crime).

**IX.    The Court Should Grant Defendant Watts' Written Requests For Identification and Production of Documents and Materials As Well As Access to Original Documents.**

Defendant Watts has written the government with specific discovery requests to which he has received no response, some of which are referenced in the arguments above. He has requested twice – and, in some cases, more often – that the government do the following:

- Produce all documents, identified by bates number and/or exhibit number, which are discussed or referred to in any of the conversations recorded by Emilio Serrano;

29

- Produce all materials discussed or brought to the government by witnesses or that is referred to in the 3500 materials as well as any 3500 materials added since Trial 1;

- Produce a true copy of the SIM card for the phone purportedly used by Serrano as Ernest Sullivan for which a UFED report was provided, and identify the carrier used by Serrano for that phone as well as any additional telephone numbers for that phone

- Advise where the original documents seized from GDC are located and whom the defense should contact in order to view the original documents gathered in the search and the originals of any documents that were exhibits in Trial 1 as well as the originals of any documents expected to be used as exhibits in the upcoming trial.

The defense has also requested in writing identification of any additional invoices and/or entries in the books and records, including entries relating to accounts receivable, which the government may claim were false or fraudulent but which were not introduced in evidence or referenced in Trial 1.  Having tried – but failed – to ascertain from the discovery produced all the documents that make up the Training database, also known as the "Zulu" database, defendant Watts has also requested identification by bates-numbers or otherwise of all documents comprising the "Zulu" database.  (Copies of the requests are attached as Exhibits A, B, and C to the Bachrach Declaration).

This information is material to the defense.  Discovery is material if the information sought is relevant to the case and may lead to the discovery of admissible evidence.  S*ee United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1983).  To be helpful or material to the defense under Rule 16, the information need not rise to the level that would trigger the government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963).  *See United States v. Aref*, 533 F.3d 72 (2d Cir. 2008).  Accordingly, we request that the Court grant our written requests for identification and production of documents and materials, as well as access to originals, pursuant

to Fed. R. Crim.P.16(d)(2), and for all 3500 materials created or produced after the time Mr.

Watts' case was severed from that of defendants Dupree and Foley.

## CONCLUSION

For all the reasons set forth above and in prior proceedings, defendant Rodney Watts

respectfully requests that the Court grant his motions in limine.

Dated: November 30, 2012
     New York, NY

                        /s/*Marion Bachrach*
                        Marion Bachrach
                        Gabrielle E. Farina

                        THOMPSON & KNIGHT LLP
                        900 Third Avenue, 20th Floor
                        New York, NY  10022
                        Tel.: (212) 751-3001
                        Fax: (212) 751-3113
                        Marion.Bachrach@tklaw.com
                        Gabrielle.Farina@tklaw.com

                        Richard D. Willstatter, Esq.
                        GREEN & WILLSTATTER
                        200 Mamaroneck Avenue, Suite 605
                        White Plains, New York 10601
                        Tel.: (914) 948-5656
                        Fax: (914) 948-8730
                        willstatter@msn.com
                        *Attorneys for Defendant Rodney Watts*